UNITED STATES DISTRICT COURT        SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Houston Professional Towing Association, § § § | | |
| Plaintiff, § § | | |
| versus § § | Civil Action H-06-2174 | |
| City of Houston, § § § | | |
| Defendant. § | | |

# Opinion on Summary Judgment

1.  *Introduction.*

An association of tow-truck operators challenges sections of the City of Houston's program for prompt removal of disabled cars from its freeways. The operators say that the program is preempted by law and restricts their speech. The operators also say that the city is taking private property by imposing a regulation with an artificially-low fixed rate for tows under the program. The city prevails.

2.  *Background.*

In May 2004, Houston enacted the SafeClear program for the rapid removal of disabled cars. The program operates all day, every day, on major Houston freeways.

Houston segmented its freeways into twenty-nine sections and auctioned them to towing companies. A company, when selected, was awarded an exclusive license by the city to tow cars in its particular section. The agreements oblige an operator to respond within six minutes of being dispatched by the city. It also mandates the equipment used, annual fee the operator pays, methods of payment the operator must accept from a motorist, and fees an operator may charge.

SafeClear distinguishes between two types of tows. Consent tows are when a motorist either calls an operator or otherwise authorizes the tow. Non-consent tows are when the car is abandoned or the owner cannot be reached.

Houston Professional Towing Association is a group of tow-truck operators. None of its members was selected for one of the exclusive towing contracts with the city.

3.  *Litigation.*

In 2005, Professional sued Houston to invalidate the ordinance. The court held that SafeClear did not violate anti-trust laws or the operators' right to equal protection of the laws. It also held that the ordinance was preempted by federal law in its creation of an exclusive contract between the city and certain towing companies and in its regulation of consent tow rates. *Houston Prof'l Towing Ass'n v. City of Houston*, 2005 WL 2121552 (S.D. Tex. Aug. 31, 2005).

That fall, the city amended the ordinance to comply with the judgment. Houston removed the exclusivity of SafeClear for consent tows. For non-consent tows the city kept the exclusivity for companies with a SafeClear contract. In response to the amended ordinance, Professional moved to hold the city in contempt. The court held that the amended ordinance complied with the order.

In the summer of 2006, Professional attacked the amended program in state court, challenging sections not litigated in the first lawsuit. Houston removed.

4.  *Federal Preemption.*

When the United States largely freed the market in motor transportation, it prohibited states from enacting their own regulations; the United States did not want fifty sets of regulations replacing the one it had abandoned. This is why, generally, a state may not enact a law related to the price, route, or service of a tow company. 49 U.S.C. § 14501(c)(1). Because the SafeClear ordinance regulates the price, route, and services of tow operators, it would be preempted were it not for exceptions in the federal law.

First, federal law does not restrict the genuine safety regulatory authority of a state. 49 U.S.C. § 14501(c)(2)(A). Governments fraudulently use "public health and safety" to impose all kinds of otherwise unjustifiable regulations – frequently on matters outside their authority. A governmental act does not violate a federal preemption, if by its terms or impact, (a) its objective relates rationally to another power entrusted to that particular segment of government and (b) the actual accomplishment of the objective and its significance justify the nature and extent of the resulting, incidental inhibition of the federally prohibited area.

The judiciary will rigorously examine the congruence of the (a) characteristics of the

act, (b) the object of the act, and (c) actual facts of its operation to maintain the supremacy of the national enactment.

Second, federal law does not preempt state laws regulating tow-trucks if the car is towed without the owner's consent. 49 U.S.C. § 14501(c)(2)(C).

Third, federal law preempts a towing program only to the extent that it is a regulation – has the "force and effect of law." 49 U.S.C. § 14501(c)(1). Although the distinction may not always be clear, when Houston pays for tows, it acts as a market participant rather than a regulator. At a minimum, the city must enter the market in ways that are parallel to other, private participants. SafeClear must accurately reflect Houston's interest in procuring a service. If SafeClear's principal effect is to encourage a general policy, it is illegal; if it addresses a specific problem by using city revenues, then it is not preempted. *See Cardinal Towing & Auto Repair, Inc. v. City of Bedford, Tex.*, 180 F.3d 686, 691 (5th Cir. 1999).

The city has offered safety claims for the program. It says that wrecked cars on Houston's freeways are dangerous to owners and passerby alike.

- Wrecks are a distraction to the traffic flowing past in both directions. Distractions as strong as the apparently universal human impulse to stare at wrecks affect safety.

- Wrecks directly or consequentially restrict the flow of traffic. Although plain efficiency is not about safety, Houstonians run into each other by abruptly changing lanes or racing ahead and cutting into the moving lanes.

The operators do not contest that stalls and wrecks exacerbate the danger of freeway travel.

A.   Sections 8-103(a) & 8-103(c).

A tow-truck called by a car owner is allowed to tow the vehicle as long as it arrives before an officer directs the removal. This section does not regulate the business of towing. Drivers may choose the operator with whom they want to deal as long as that choice does not have the effect – through delay – of interfering with the officer's responsibility to manage the wreck in particular or the freeway in general. SafeClear § 8-103(c)(1)-(3). These sections are not preempted.

B. *Section 8-113.*

An operator must tell a driver of his company, address, telephone, storage location, and fee. This does not affect prices or routes; it is a consumer protection disclosure. One would think that an operator who would not volunteer that information would have his service rejected by the driver, but the stress of being stranded on a crowded freeway may affect drivers' clarity. The operators have not established how the required disclosure conflicts with the federal law; the city requires all stores to post their permits.

C. *Section 8-118.*

This section limits the number of tow trucks at a wreck to one for each car needing a tow. There is no exception for a Professional operator called to the scene by a driver who arrives after a SafeClear operator has already begun removal. The city requires that wrecks be removed as quickly as possible for the safety of drivers and passerby. If a SafeClear operator – the only one allowed to cruise for business – is already on the scene, the city may prohibit additional operators from delaying or complicating the removal process by limiting secondary congestion at wrecks. The section is not preempted.

D. *Section 8-127(3)-(5) & (8).*

Section 8-127 establishes the terms of the SafeClear contracts. Operators under the program must adhere to the city-set fees for both consent and non-consent tows. For the association to have standing, some of its members must independently have standing. *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006). None of the members of Professional is a party to a SafeClear contract. Without an actual or imminent injury, Professional has no standing to challenge the section. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Even if it did, the provisions are not preempted because the city is contracting for a service and buying tows. The city exchanges the advantage of the exclusive territory – a clear market restriction – for the operator's commitment to a specific price and level of service. While this sort of arrangement is the common one for market allocation programs that have nothing to do with safety or frequently any public interest, here it is tailored to eliminating a real danger.

E.   *Section 8-123(a).*

This section prohibits an operator, who has been called by an owner, from charging his usual rate when the police are already directing the removal. In this situation, the tow is considered without consent. The rates for non-consent tows are lower than the market rate.

Removing wrecks is both a safety and law-enforcement matter. No market regulation would be adopted that truncated the officer's authority to direct the resolution of the problem. When an officer takes control over the removal, the city may legitimately treat it as a non-consent tow. Disagreements over rates aside, Professional's operators could not refuse to obey an officer directions in the removal of a wreck. The city's responsibility to clear wrecks – without this law – would allow it to interfere with the incipient contract between the driver and called operator.

F.   *Section 8-123(e).*

This section requires storage yards to charge a fee of $10 in addition to their own fees. Professional's operators are not storage yards. It has no standing to challenge a tax on them, and a non-punitive assessment of approximate costs for including junk yards in SafeClear does not violate the federal ban on market restrictions.

G.   *Section 8-128.*

A tow operator may not solicit business or remove a vehicle until the police have finished with the investigation. This restriction uses Houston's residual safety and law-enforcement authority. Prohibiting operators or anyone else from altering the scene of a police investigation without an officer's permission is not a route or rate plan.

The city insists that because this section echos the Texas penal code it cannot be preempted. Tex. Penal Code § 38.15(a)(1) (2007). As matter of principle, the city is wrong. Use of the penal law for illegitimate purposes can not save it from invalidation. It simply is not directed at the business of towing.

The ban on solicitation could be addressed as a secondary attempt to keep the witnesses free from distraction, but it is better treated as part of the city's wholesale ban on solicitation, which is covered later.

5.   *State Preemption.*

Houston is a home-rule city. Those cities have full self-government with residual

authority to adopt policies suited to their circumstances. Their authority is residual because it is limited by the Constitution, federal laws, Texas Constitution, and Texas statutes. Tex. Const. Art. XI, § 5. Legislative limits on a city's authority must be clear. *Quick v. City of Austin*, 7 S.W.3d 109, 122 (Tex. 1998). If the legislature has enacted a law addressing a subject, it voids a city ordinance only if a "reasonable construction leaving both in effect" can not be found. *City of Richardson v. Responsible Dog Owners*, 794 S.W.2d 17, 19 (Tex. 1990).

Texas law allows an operator of a junk yard to charge the owner of a car fees required to be paid to the police. Tex. Occ. Code ann. § 2303.155(b)(4); 43 Tex. Adm. Code § 18.93(4). SafeClear requires a junk yard to collect a fee of $10 and to remit it to the police. It says it is to defray the costs of enforcing responsible behavior in connection with non-consent tows. The ordinance is consistent with state law. It is not preempted.

6. *Regulatory Taking.*

Assuming that Professional is correct that the city's rate for non-consent tows is grossly impractical, Houston takes nothing from its members because they are only affected by the disincentive to bid on the SafeClear contracts in the first place. If the price were truly uneconomical, the SafeClear contractors would not have bid.

By its program the city does remove an easy, lucrative segment of the market for tows from the free market. It justifies this by its buying tows from those with whom it contracts for a specified service – prompt 24-hour coverage and a low rate. Of course, it justifies buying tows by the safety effect of lingering hulks and crowding tow trucks. When the city buys a service from one contractor it necessarily excludes others; that is not regulation, if it is honest.

Regulation, even when participation may not be obligatory, may be a taking. The myth of the disinterested expertise of the regulatory state can not be allowed to eviscerate the Constitution's restrictions on confiscation of citizens' property. *Contra Whitney v. Heckler*, 780 F.2d 963, 972 (11th Cir. 1986). Professional's operators may choose to tow on freeways; they may charge the price they wish for consent tows. For cars with no driver to consent or for wrecks under an officer's control, the city rate applies.

7. *Commercial Speech.*

The Constitution says that all laws restricting speech are banned – that governments "shall make no law." Yes, no law. The Constitution protects commercial speech from governmental regulation. *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425

U.S. 748, 762 (1976).  A supine judiciary has tolerated many evasions of the constitutional ban.  Many of those jurisprudential dodges arose in the context of regulating business because it was somehow a lesser species than politics or religion.  Now, however, the regulatory state has come to politics.  *See generally McConnell v. Federal Election Com'n*, 540 U.S. 93 (2003).

To restrict expression consistent with the Constitution, a governmental rule must address a substantive evil with adverse effects for speech only as a marginal, indirect consequence.  The only reconciliation allowed by the Constitution is when the speech directly implicates a conflict that would be recognized in Newtonian physics.  City streets can be used for parade routes or routine traffic but not both – at least not simultaneously.  Handing leaflets to passers-by may provoke them to discard them in violation of the littering laws, but Houston may not arrest the distributor instead of the litterer.

Like safety, fraud has been a favorite refuge of regulators of publications for economic purposes.  Put simply, the Constitution prohibits government from using restrictions on speech as a means to regulate other things.  Attacking an evil directly may well be more difficult than banning talk about it, but the Constitution does not enshrine the path of least inconvenience for policy makers and bureaucrats.

SafeClear prohibits non-contract operators from soliciting business on the freeways.  This is a restriction on speech.  It is also a restriction on the market.  Favoring contract operators for non-consent tows is Constitutional because it meets Newton's test.  The direct, inescapable consequence of free solicitation on freeways is a clear increase in an immediate physical danger.  Operators will roam the already congested freeways hunting wrecks.  They will race each other to the wreck to get the drivers committed before the competition arrives.  They will stop in traffic lanes or on shoulders compounding the congestion and confusion of the scene.

The participants in the wreck cannot help being a distraction, but the city may restrict social, political, religious, and commercial access to them while they are on the freeway.  In a rough converse, the city cannot prohibit a man from offering handbills to passing motorists, but it can make it illegal for them to stop in traffic lanes.

The potential for distracting drivers has been used spuriously to restrict speech and interstate commerce.  See *Railway Express v. New York*, 336 U.S. 106 (1949); *Metromedia, Inc., v. City of San Diego*, 453 U.S. 490, 508-09 (1981).  Here it is the addition of trucks and people to the scene rather than potential distraction in the abstract that allows the city to intervene.

A.   *Section 8-127(8) & 8-128.*

A tow operator must wait until police have completed their investigation at the scene, before they may solicit business or tow a vehicle. This section simply repeats the idea that outside service contractors may not disrupt the scene of an investigation until the policeman says it is permissible.

The sections directly advance traffic safety and police effectiveness. No less restrictive measures would achieve this compellingly legitimate result.

B.   *SafeClear Contract.*

None of Professional's members is a party to a SafeClear contract. Professional has no connection to the contract so it can not challenge its interference with free expression.

8.   *Conclusion.*

The SafeClear program is a limited, effective attempt to use Houston's regulatory authority to move stalled cars on freeways. Removing them quickly without expanding the scene with people and trucks is a rational safety program when it is coupled with the parts that seek to assure early, reliable tows.

SafeClear may not work as it was planned, but it is a policy choice free from gratuitous, tangential, or surreptitious attacks on speech or re-regulation of the business of towing.

Houston Professional Towing Association will take nothing from the City of Houston.


Signed on April 16, 2008, at Houston, Texas.


Lynn N. Hughes   USDJ
United States District Judge